UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Robert Rockwood</u>
<u>and Roxana Marchosky</u>

      v.                           Civil No. 08-cv-168-JL
                                      Opinion No. 2010 DNH 213
<u>SKF USA Inc.</u>

**<u>OPINION AND ORDER</u>**

This bitter dispute over a failed deal to buy a company
raises questions about the reach of the promissory estoppel
doctrine.  The plaintiffs, Robert Rockwood and Roxana Marchosky,
claim that the defendant, SKF USA Inc., "through its cumulative
words, conduct, and acts of assurance, manifested an intention to
purchase" the company they owned, Environamics, Inc.  The
plaintiffs further allege that they reasonably relied on this
"promise" to their detriment--most seriously by guaranteeing a
bank loan to Environamics on which it eventually defaulted,
resulting in foreclosure, repossession of the company's assets,
and the plaintiffs' $5 million personal liability to the bank
after SKF ultimately declined to buy the company.

SKF has moved for summary judgment on this claim, arguing
that its "words and conduct" never amounted to an enforceable
promise to buy Environamics but that, in any event, the
plaintiffs could not have reasonably relied on that promise in

the face of their written agreement with SKF that gave it the option to buy Environamics, instead of committing it to do so. This court has jurisdiction over this matter between the plaintiffs, New Hampshire citizens, and SKF, a Pennsylvania-based corporation, under 28 U.S.C. § 1331(a)(1) (diversity).

Following oral argument, SKF's motion is granted.  Even if the plaintiffs are right that New Hampshire law applies, it does not allow recovery in promissory estoppel where the parties have an enforceable agreement that expressly conflicts with the alleged promise.  Here, the option agreement was enforceable and, by its very nature, expressly conflicted with any promise by SKF obligating it to buy Environamics.  Furthermore, the plaintiffs could not have reasonably relied on the "words and conduct" allegedly constituting that promise, because nearly all of it occurred before the parties entered into the option agreement, which by its express terms superseded "all prior agreements, conversations, understandings, and negotiations" between the parties.  Though the plaintiffs point to one set of statements SKF allegedly made after entering into the agreement--when they say they were told not to worry about guaranteeing the loan, because SKF had committed to buy Environamics--they could not have reasonably relied on that as a promise by SKF to do anything other than to buy the company pursuant to the option agreement. Indeed, that was how they had characterized the very same

2

statements in successfully opposing an earlier summary judgment motion by SKF.  But the plaintiffs have since expressly disclaimed that theory, so they cannot avoid summary judgment on their promissory estoppel claim based on these alleged comments. Finally, the plaintiffs' argument that a joint venture existed between SKF and Environamics is incorrect as a matter of law and ultimately irrelevant to their promissory estoppel claim anyway.

## I.   **Applicable legal standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  Under this rule, "[o]nce the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion.'"  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).

In ruling on a motion for summary judgment, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  The following facts are set forth accordingly.

## II.   Background

**A.   Factual history**

**1.   They meet**

Rockwood and Marchosky each owned half of the stock of Environamics, a corporation that, until its demise, designed, manufactured, and sold pumps and sealing devices from its headquarters in Hudson, New Hampshire.  Rockwood, an engineer by training, has worked in the industry for 35 years, and served as the company's president and chief executive officer; Marchosky, who has more than 30 years' experience as an attorney, served as the company's vice president and general counsel.  Among the company's innovations was a system for retrofitting the "power end" of a pump made by any manufacturer with an improved component made by Environamics, enhancing performance and extending product life.

In April 2003, Environamics was in difficult financial straits after defaulting on its obligations to an outside lender, who had secured the appointment of a receiver over the company's affairs until it posted $1.5 million as security for its debt.  Fortuitously--or at least it seemed at the time--Environamics happened to get a sales call from SKF, one of its vendors, in September 2003, during which the salesman announced SKF's hopes to develop a power end "that could fit on anybody's pump."  After

learning of this, Rockwood called SKF to inform it that
Environamics "had already developed and patented" that very
technology.  A sit-down meeting between the plaintiffs and SKF,
including its vice president, Timothy Richards, soon followed.
SKF is the United States subsidiary of AB SKF, a Swedish
corporation that is the world's largest manufacturer of ball
bearings, which are an essential component of industrial pumps.

## 2.    The courtship

Two weeks after the parties met, Richards called Rockwood to
tell him that "SKF had decided to move very rapidly toward a
possible acquisition of Environamics."  During regular
conversations with Rockwood over the next few weeks, Richards
"continually expressed that SKF was moving as fast as possible to
acquire Environamics."  Then, at meetings in November 2003, the
plaintiffs and Richards discussed the structure of the potential
deal as well as post-acquisition financial and operational
details.  In one of the meetings, Richards said that "in view of
SKF's planned acquisition, Environamics should cease seeking out
and opening new distributorship accounts," which the company did.
Environamics also "held off pursuing other opportunities" for
financing in light of "SKF's statements and [its] demonstrated
desire to acquire" the company.  In early December 2003, in fact,
Richards dissuaded Rockwood from pursuing a proposal from

Environamics's lender to convert its debt into an equity position, arguing that "SKF had committed to buying Environamics and had no interest in sharing equity with anyone." Instead, Richards invited Rockwood to submit a "wish list" of his company's cash-flow needs that would allow it to "bridge the gap until the deal could get finalized in January 2004." In response, Rockwood asked SKF for $250,000 within the next week, and an additional $4 million within the following month, explaining that the parties' agreement to cease "opening stocking distributors . . . has eliminated revenues for Environamics during [the] interim period[] until we join forces."  SKF immediately provided Environamics with the requested $250,000, which Richards described to Rockwood as ensuring "that Environamics ceased any further conversations with any other potential suitors and to buy time while [SKF] worked out the remainder of the acquisition deal."  Richards also said "he didn't think the $4 million request would be any problem since SKF had committed to buying Environamics."  Rockwood says that in reliance on these statements he "ceased any further discussions with [Environamics's lender] about an equity deal."

As it turned out, the request for $4 million did present a problem, because SKF's vice president of finance was not "willing to risk more" than $2 million, in the form of a prepayment for products to be supplied by Environamics.  In a meeting in mid-

6

December 2003, though, Richards--joined by another SKF executive, Donald Poland--assured Rockwood that the "$2 Million payment was just an initial step in the relationship and that SKF's commitment to buy Environamics had not wavered."  After delivering the bad news about Rockwood's funding request, in fact, Richards repeatedly told him, "don't worry," "we want Environamics," and "we are buying Environamics."

Richards subsequently asked the plaintiffs for certain "items we require to proceed to the next stage of our proposed partnership," including information on the products comprising the purchase order to be used to generate SKF's $2 million payment to Environamics.  When Rockwood asked what products SKF wanted, Richards responded that it did not matter, because the purchase order "was in fact just a method to get needed cash to Environamics in connection with SKF's planned acquisition." Indeed, after Rockwood provided the requested list of $2 million in Environamics products, they were never delivered to SKF, but remained in the Environamics warehouse.  Thus, the plaintiffs say, "SKF was not 'purchasing' inventory as it now claims but was channeling funds to Environamics in furtherance of its inevitable acquisition" (footnote omitted).[1]

---

[1]The plaintiffs also point to a number of communications among SKF employees throughout late 2003 which, as the plaintiffs now characterize them, show SKF's "lust[] for Environamics technology and patents" (formatting altered).  There is no

### 3.   The engagement

Despite how they now say they understood the tenor of their dealings with SKF to that point, on January 14, 2004, the plaintiffs entered into an "Option Agreement" with SKF that, as its title suggests, did not make the acquisition "inevitable," but rather gave SKF "an irrevocable option to purchase all, but not less than all, of the outstanding shares of [s]tock" in Environamics.  On the same day, SKF and Environamics entered into a "buy-sell agreement" making SKF the "exclusive marketer and reseller" of Environamics pumps and related products and, in essence, making Environamics the exclusive supplier of those products to SKF.

SKF's option to buy Environamics under the option agreement was to last for 15 months after its execution, subject to a requirement that the parties try in good faith to negotiate a 9-month extension if "in the event circumstances arise which may require additional time to achieve the sales targets contemplated by the parties under the buy-sell agreement" (capitalization omitted).  Specifically, the option agreement provided that, "if it becomes apparent during the option term that the annual rate of resale of [Environamics] products by [SKF] under the buy-sell

_____

indication, however, that the plaintiffs became aware of those communications at any point before receiving them in discovery after they commenced this lawsuit.

agreement is less than $10 million, the parties will enter into
good faith negotiations to extend the option term for an
additional period of up to nine months" (capitalization and
parenthetical omitted).

The option agreement set an "exercise price" of $9 million,
minus Environamics's debt, and adjusted by the difference between
any outstanding obligations between SKF and Environamics.  The
option agreement also provided that, if the option were
exercised, SKF would pay the plaintiffs a 10 percent royalty on
its gross profits on Environamics products for a 7-year period.
The option agreement stated that it (together with, in relevant
part, the buy-sell agreement) "constitutes the entire agreement
and supersedes all prior agreements, conversations,
understandings and negotiations, both written and oral, between
the parties with respect to the subject matter hereof."  It also
provided that it "shall be governed and construed in accordance
with the laws of the Commonwealth of Pennsylvania, without regard
to the laws that are applicable under conflicts of laws
principles."  The buy-sell agreement contained a nearly identical
choice-of-law clause.

The exclusivity provisions of the buy-sell agreement were to
last as long as the option agreement gave SKF to exercise its
option to buy Environamics (though each party had the right to
terminate the buy-sell agreement earlier).  The buy-sell

9

agreement allowed SKF to demand that the products supplied by Environamics include SKF's bearings, and "to label or otherwise mark or identify the [p]roducts . . . with the 'SKF' brand." The buy-sell agreement also provided that nothing in it "shall constitute or imply any promise or intention by [SKF] to (i) make any equity investment in, or advancement of any loans to, [Environamics] or (ii) require [SKF] to make any minimum amount of purchases of [p]roducts from" Environamics.  Finally, the buy-sell agreement cautioned that "[t]he relationship of the parties under this Agreement shall be and at all times remain one of independent contractors and not principal and agent, partners, or joint venturers."

The plaintiffs charge that, despite this language, SKF "repeatedly held itself out to [them] and third parties as being in a joint venture with Environamics."  But, with the exception of the letter Richards gave Rockwood to deliver to Wells Fargo, discussed infra, the plaintiffs have not come forward with any evidence of communications from SKF to them, or other Environamics personnel, describing the relationship as a joint venture.[2]  The plaintiffs have supplied two e-mails from SKF

_____

[2]The plaintiffs also rely on notes, taken by an SKF employee at one late January 2004 meeting with the plaintiffs, that state "message to customer must include a strong point about our continued working together --> joint venture sends the correct message."  But the notes do not attribute that comment to anyone at the meeting (if in fact it was a comment, as opposed to the uncommunicated thoughts of the note-taker himself).

personnel to its customers referring to its "joint venture marketing agreement with Environamics," but there is no evidence that the plaintiffs saw those e-mails at any point before commencing this litigation.

After making SKF the exclusive distributor of its products through the buy-sell agreement, Environamics terminated its relationships with all of its other distributors in late January 2004.  SKF then "directed" that Rockwood and Environamics's director of marketing, Allen LeBoeuf, "accompany [SKF's] sales personnel to Environamics['s] existing and potential customers for the purpose of announcing the joint venture, delivering the marketing materials, and transferring customer accounts to SKF."

The plaintiffs claim that these marketing materials--which consist of a series of one-page advertisements--"removed the Environamics brand name from Environamics pumps."  While the pump pictured in each of the ads has a label bearing the name "SKF,"[3] the accompanying copy refers to the "Environamics power frame cartridge."  Yet, as the plaintiffs point out, SKF takes credit in the copy for having "imagined" the power end upgrades that were in fact invented by Rockwood, and passes off, as its own, testimonials from Environamics's customers.  SKF also placed its

_____

[3]The entire text of the label on the pumps pictured in the ads is unclear in the versions of these materials submitted by the plaintiffs, but SKF's interrogatory answers explain that the labels read "SKF Equipped."

name on the shipping papers and warranties for Environamics products (though, like the marketing materials, the warranties referred to the products by the "Environamics" name).

Rockwood says that he assented to this "transfer" to SKF of "whatever independent goodwill Environamics had with [its] customers" based on "Richards' assurances that SKF's acquisition of Environamics was a 'done deal.'" But Rockwood does not identify any particular communications from Richards to that effect, aside from his numerous alleged comments that preceded the execution of the option agreement.

In the meantime, Richards told Rockwood that he "needed to go to the marketplace in search of financing for Environamics," though Rockwood "knew full well that Environamics[], alone, did not have the sales or revenue to support" it. Rockwood told Richards of this concern—-and of Rockwood's disappointment that "no additional funding can be provided by SKF, particularly in view of [the] cancellation of distributors" necessitated by the exclusive buy-sell arrangement, to Richards.

Rockwood nevertheless attempted to borrow money from, among other banks, Wells Fargo, to which Rockwood had been "connected" by Richards. After Wells Fargo "twice declined to extend the requested financing," Richards said he would "talk to" the bank, and went on to provide Rockwood with a letter to give to Wells Fargo. This communiqué, on SKF letterhead, described itself as

an "outline of the resources and assets we have committed to our recently negotiated joint venture with Environamics."  The letter stated that SKF had "launched the new partnership with an investment of $2.2 [million]," and that the "value of SKF's corporate commitment to this venture is estimated to exceed $10 [million] over the next year to fifteen months."

In reviewing Environamics's credit application, Wells Fargo representatives spoke to Richards, who described Environamics's pumps as "revolutionary" and stated that "with or without Environamics and its management, SKF wants this technology."[4]  In line with this comment, Wells Fargo did not believe that SKF had irrevocably committed to buying Environamics, but understood that the companies had "signed a joint venture agreement, in which once sales hit a $10 [million] annual run rate, SKF will buy Environamics" and recognized the risk that the "[s]ales do not materialize, and SKF does not exercise its option."  Wells Fargo

_____

[4]The plaintiffs make much of Richards's deposition testimony that "the last thing I did with respect to the loan from Wells Fargo was to make the introduction over the phone" at the outset of the process (though he also testified that he "followed up with [Wells Fargo] expressing SKF's technical interest in the [Environamics] product throughout the course of the summer" of 2004).  Even if there is a conflict between that testimony and Wells Fargo's loan file, however, whether "SKF was the driving force behind the Wells Fargo financing" (as the plaintiffs contend) makes no difference to the outcome of the pending summary judgment motion.  There is no indication that they knew, prior to their alleged detrimental reliance, about SKF's involvement with the loan (aside from Richards's saying he would "talk to" the bank).  See infra Part III.B.1.

13

also noted that outside valuation firms had assessed the worth of Environamics's patents at $18 million, and the liquidation value of its inventory at about $2 million.

Based on this information, Wells Fargo agreed to extend a $3,000,000 line of credit to Environamics--but only if Rockwood and Marchosky personally guaranteed the loan.  Rockwood recalls that he was "concerned about" this requirement and, on three separate occasions in April and May 2004, expressed those concerns to Richards.  In response, Richards told Rockwood, "don't worry about the loan and guarantee because SKF had committed to buy Environamics."  Richards added that "he had specifically spoken with SKF Service Division President Donald Poland, who confirmed SKF's commitment."[5]  Rockwood recalls that "[i]n reliance on the steps already taken to that point and on SKF's conduct, assurances, and promises," he and Marchosky executed the guarantees necessary for the loan from Wells Fargo.

---

[5]The plaintiffs point to an April 2004 e-mail to Poland from Steve Irvine, SKF's vice president of strategic marketing, which they characterize as confirming "SKF's view of the inevitability of the deal."  But even if this is a reasonable characterization (which is doubtful, considering that the e-mail actually discusses dissension within SKF as to whether "the acquisition of Environamics [is] a prudent investment"), there is no indication that the plaintiffs ever saw this e-mail at any time before they, presumably, received it in discovery in this lawsuit.

Wells Fargo approved the loan.[6]  Environamics, "as directed"
by SKF, then "spent down the funds building up the inventory SKF
required and funding" Rockwood's and LeBoeuf's "travels in
support of the SKF sales force."  By October 2004, however, it
had become clear that Environamics would not achieve $10 million
in sales for that year (under the option agreement, this
shortfall required the parties to engage in good-faith
negotiations to extend the option period).  The plaintiffs blame
the shortfall on SKF's failure to "use its ordinary sales efforts
to sell Environamics products."  They further allege that this
"weak sales effort by SKF" failed to generate enough cash to make
any of the monthly payments on the Wells Fargo loan.

**4.   The breakup**

SKF informed the plaintiffs in October 2004 that it had
decided not to go forward with an acquisition of Environamics

---

[6]In opposing SKF's first motion for summary judgment in this
case, see infra Part II.B.2, the plaintiffs relied on a version
of Richards's letter to Wells Fargo on which Rockwood claims to
have written back, "We did it Tim!  Thanks to this letter, but
more importantly your confirmation that SKF is definitely buying
Environamics, we got the loan from Wells Fargo" (capitalization
corrected).  At his deposition, Rockwood could not recall how he
transmitted this note to Richards--who testified that he did not
recall receiving it--and the document itself bears no indication
that it was transmitted by any means (though Marchosky testified
that she personally placed it in an envelope and mailed it).  But
the court need not consider the significance (if any) of this
document because the plaintiffs do not rely on it in opposing the
present summary judgment motion.

under the option agreement.  SKF proposed to purchase the company on other terms, <u>viz.</u>, an up-front payment of $5.8 million (including $1.2 million to cover its accounts payable) plus a royalty on the next seven years' of sales.[7]  At the same time, however, SKF noted that it had "not cancelled" the option agreement, invoking its "obligation to negotiate in good faith an extension to the option period."  In January 2005, Rockwood rejected SKF's new proposal and, for good measure, stated that, "as far as the original acquisition agreement is concerned, that no longer exists."

Rockwood repeated these sentiments in late March and early April 2005, stating that the plaintiffs were "not open to revisiting or reinstating the original agreement" and that "SKF no longer has the option to purchase" Environamics.  Yet the parties continued to negotiate, eventually resulting in a "letter of interest" from SKF to the plaintiffs in late April 2005.  This letter expressed the parties' "desire to enter into a binding agreement" for SKF to purchase Environamics "on a debt-free basis" for $14 million, less $500,000 in "additional financial support" from SKF while the deal was finalized.

─────────────────

[7]There is a dispute over the terms of this offer--Rockwood recalls that all of Environamics's debt would have been subtracted from the up-front payment, while SKF insists otherwise--but ultimately this disagreement is immaterial.

The plaintiffs responded by asking for additional time to consider the proposal, which SKF granted, and ultimately, by asking to change certain terms.  Eventually, on June 13, 2005, after extending the deadline for acceptance several more times, SKF forwarded the plaintiffs a version of the letter of intent that "incorporated any and all [proposed] revisions that would . . . comply with SKF policies and practices" and, as such, was "the final version" as far as SKF was concerned.  This version increased the "additional financial support" that SKF could potentially provide during the signing period to $1.5 million, with $1 million of that sum to be deducted from the price.

This version of the letter of interest provided that it would expire if the plaintiffs did not return a countersigned copy by 5 p.m. on June 17, 2005.  Rockwood says that, after receiving this version, he "called up Richards and informed him that the terms . . . were acceptable and that [the plaintiffs] would be signing"--as well as that Rockwood's "mother was ill and in the hospital in Boston and [he] would not be able to sign until" June 17, the deadline.  The plaintiffs do not say what, if anything, Richards said in response, but at around 3:30 p.m. on June 17--in a particularly stark illustration of the rule that the offeror is master of the offer--Richards told the plaintiffs by fax and e-mail that the letter of interest was withdrawn.

17

In withdrawing the letter, and deciding "to defer pursuing
an acquisition of Environamics," SKF nevertheless expressed its
interest in "continuing its commercial representation of
[Environamics] products" on a non-exclusive basis.  Yet SKF
informed the plaintiffs in September 2005 that its relationship
with Environamics was over--by that point, the option agreement
and, as a consequence, the buy-sell agreement, had expired months
ago, on April 15, 2005.  SKF did make one last offer to purchase
Environamics in late October 2005, for $7 million less any debt,
including not only $1.5 million to be advanced during any
negotations, but also the more than $3 million Environamics owed
to Wells Fargo at that point, having drawn down the entire line
of credit.  The plaintiffs did not accept.  By December 2005, the
parties' relationship had become marred by cross-allegations of
bad faith, including Rockwood's charge that SKF was withholding
information on orders it had received for Environamics products.

**5.   The fallout**

Wells Fargo declared Environamics to be in default of the
loan and, by the spring of 2007, had demanded possession of the
collateral, which constituted essentially all of the company's
assets, including its intellectual property.  Wells Fargo then
brought suit against Environamics and the plaintiffs in
Massachusetts Superior Court seeking to collect on the loan and

18

guarantees, as well as a preliminary injunction entitling Wells Fargo to possession of the collateral.  <u>Wells Fargo Bus. Credit v. Environamics Corp.</u>, No. 07-1890-B (Mass. Super. Ct. May 7, 2007).  After the Superior Court issued the preliminary injunction, though, Environamics filed for bankruptcy protection in the Bankruptcy Court for the District of New Hampshire.  <u>In re Environamics Corp.</u>, No. 07-11338 (Bkrtcy. D.N.H. June 27, 2007).  This resulted in the automatic stay of the Superior Court lawsuit against Environamics, <u>see</u> 11 U.S.C. § 362(a)(1), but, ultimately, the Bankruptcy Court awarded control of the company to Wells Fargo, which proceeded to take possession of the Environamics facility and its contents in September 2007.

In January 2008, Wells Fargo sold the repossessed Environamics assets to a third party for $479,000.  The Superior Court later entered summary judgment for Wells Fargo on its claims against the plaintiffs under the guarantees, but was recently reversed in part by the Massachusetts Appeals Court. That court ruled that a genuine issue of material fact existed as to whether Wells Fargo's sale of the collateral was commercially reasonable under the Uniform Commercial Code, but otherwise affirmed the Superior Court's order.  <u>See</u> <u>Wells Fargo Bus. Credit v. Environamics Corp.</u>, 934 N.E.2d 283 (Mass. App. Ct. 2010).

**B.   Procedural history**

**1.   Earlier versions of the complaint**

In March 2008, the plaintiffs, represented by Marchosky, filed a 39-count complaint against SKF in Rockingham County Superior Court.  SKF removed the action to this court, see 28 U.S.C. § 1441, and outside counsel soon appeared on behalf of the plaintiffs.  Following a motion to dismiss by SKF, see Fed. R. Civ. P. 12(b)(6), the plaintiffs filed--with leave of court and SKF's assent--a first amended complaint in just five counts.  Further motion practice resulted in a second amended complaint, also in five counts, though the plaintiffs agreed not to seek damages under one of those counts, equitable estoppel.

The claims for relief in the second amended complaint were:

• breach of contract, in the form of SKF's agreements that it would (1) "exercise its option under the terms of the Option Agreement in exchange for the agreement by [the plaintiffs] to take out and personally guarantee the Wells Fargo loan" and (2) "expend $10 million on its Environamics sales effort and put numerous sales people in the field";

• promissory estoppel, in that--in reliance on these promises--the plaintiffs "acted to their detriment by taking out and personally guaranteeing the Wells Fargo loan";

• violation of the New Hampshire Consumer Protection Act, in the form of these "false promises," as well as SKF's "efforts to pressure [the plaintiffs] to accept a lower price" for Environamics, "SKF's refusals to provide information" and "misrepresentations regarding its sales and sales efforts," its "withholding of orders and threats to cancel orders," its "threats to violate the Buy-Sell agreement," and its "other actions"; and

- through these same actions, violation of the covenant
of good faith under the option agreement.

The second amended complaint, like its prior versions,
demanded trial by jury.

## 2.    **SKF's first motion for summary judgment**

In due course, SKF moved for summary judgment, arguing,
<u>inter alia</u>, that (1) there was no evidence that the alleged
promises had even been made, (2) regardless, the alleged promises
were unenforceable as a matter of law for lack of specificity,
and (3) no rational factfinder could conclude that the plaintiffs
reasonably relied on the alleged promises, due to both their lack
of specificity and the presence of a written agreement covering
the same subject.  The plaintiffs responded, in relevant part,
that they had "testified extensively that if they took out and
personally guaranteed the Wells Fargo loan, SKF would buy their
stock in Environamics pursuant to the option agreement," which
"establishes all of the specifics regarding the contract."

At oral argument on the motion, counsel for SKF pointed to
an exchange from Rockwood's deposition where he was asked,
"you're saying that the promise they made to you was to exercise
the option agreement?" and responded, "Not exercise the option
agreement.  They said they would definitely buy the company."
Asked by the court to explain this statement, counsel for the

plaintiffs stated that this testimony, "read in context of his many other statements in the record," was simply "shorthand" for "this was an agreement to buy as per the terms of the option" agreement.  Counsel for the plaintiffs also quoted another portion of Rockwood's deposition where, asked "When Mr. Richards told you . . . that SKF was definitely going to buy the company, what did you understand the terms of the purchase to be?" Rockwood responded, "The terms of the purchase was [*sic*] still what was stated in the original acquisition," i.e. "as per the terms of the option agreement."

Ultimately, the court (Barbadoro, J.) ordered each of the plaintiffs to file an affidavit stating "the time, place and specific content" of the communications comprising SKF's alleged oral promise to exercise the option.  Judge Barbadoro also identified, as another potential problem with the plaintiffs' claims, whether they had "repudiated this alleged oral contract" because "they made very clear" to SKF in late 2004 and early 2005 that "they weren't going to tender the stock . . . under the terms of that deal," but suggested that SKF had not sufficiently presented that argument in its summary judgment papers.

Each of the plaintiffs went on to submit an affidavit, in response to Judge Barbadoro's order, that described three telephone conversations between them and Richards in or around April 2004.  These affidavits recount that Richards told the

plaintiffs they should "not worry about taking out the Wells
Fargo loan because SKF was buying their stock in Environamics
under the Option Agreement," that "SKF was going to exercise its
option under the Option Agreement and buy the company," and that
the president of SKF's service division, Poland, "had confirmed
. . . . SKF would buy the company under the Option Agreement."
Judge Barbadoro then denied SKF's motion for summary judgment in
a margin order, ruling that "[f]acts material to the resolution
of the motion remain in genuine dispute."  Order of Nov. 3, 2009.


###   3.   Sanctions and new counsel

Just after this ruling, Magistrate Judge Muirhead granted,
in part, SKF's motion to compel certain discovery from the
plaintiffs.  Order of Nov. 5, 2009.  In particular, Judge
Muirhead ordered the plaintiffs to "physically produce[]" their
personal laptop computers, which bore stickers identifying them
as property of Environamics, "so that the hard drive may be
mirror-imaged."  Though the plaintiffs did so, SKF's inspection
of the laptops revealed that a number of files had been recently
deleted from Rockwood's computer and a program capable of making
deleted files unrecoverable had been recently accessed on both
plaintiffs' computers.  SKF filed a motion for sanctions, arguing
that this conduct amounted to spoliation of evidence and a
violation of the discovery order so as to warrant dismissal of

23

their case.  Judge Barbadoro later granted another motion SKF had
filed, to strike the jury demand from the plaintiffs' second
amended complaint, based on a clause in the option agreement that
each party "waives any right it may have to a trial by jury in
respect of any litigation directly or indirectly arising out of
or relating to the agreement or the transactions contemplated
hereby."  2009 DNH 184.

Before SKF filed its motion for sanctions, it had confronted
the plaintiffs' counsel with the evidence supporting the motion
at a meeting at which they were expecting to receive a settlement
offer.  This prompted the plaintiffs' counsel to file a motion
for leave to withdraw from the representation, arguing that,
while they had resolved to remain in the case until receiving the
anticipated offer, they had long harbored irreconcilable
differences with the plaintiffs, including "a fundamental
difference about how to proceed."  They also filed a motion to
continue the trial, which was less than two months away at that
point.  Both SKF and the plaintiffs themselves objected to the
withdrawal, and SKF also objected to any continuance.  Judge
Barbadoro then recused himself from the case, resulting in its
reassignment to the undersigned.

To resolve the then-pending motions, this court held an in-
chambers conference, including a portion in which the plaintiffs
and their counsel were heard ex parte, followed by an on-the-

record hearing in open court.  The court (Laplante, J.) granted both the withdrawal and the continuance, giving the plaintiffs 60 days to find successor counsel.  With the benefit of an extension of that deadline, the plaintiffs eventually did so.

### D.    The third amended complaint

Through new counsel, the plaintiffs filed a motion to amend their complaint to add allegations in support of the promissory estoppel count so, they explained, "it is tied to the larger and more general promise, 'Don't worry, we are buying your company.'" SKF objected to the proposed amendment as untimely (because both the discovery cut-off and the summary judgment deadline had already passed) and barred by judicial estoppel (because, at the summary judgment hearing before Judge Barbadoro, the plaintiffs had essentially abandoned this theory of promissory estoppel in favor of one based on SKF's alleged oral promises to buy Environamics pursuant to the terms of the option agreement).

In response, the plaintiffs explained that their former promissory estoppel claim was "solely based on [SKF's] verbal promise to buy Environamics pursuant to the terms of the Option Agreement" while their proposed new promissory estoppel claim was "independent of and not reliant upon the existence of the Option Agreement."  Instead, their new claim "allege[d] a broad array of words and conduct over a course of several months" that amounted

25

to a promise to buy Environamics—-and an enforceable one at that.
The plaintiffs maintained that "where the promise is, in whole or
in part, implied by conduct, the requisite specificity for the
promise is less than if the promise is purely verbal."  Thus, the
plaintiffs argued, their proposed amended promissory estoppel
claim was neither inconsistent with its antecedent version, so as
to give rise to judicial estoppel, nor futile.

The court allowed the proposed amendment, subject to two
proposals the plaintiffs had made:  first, that they would forego
any "claims for breach of contract or that specifically arise in
connection with the Option Agreement" and, second, that the court
could "revisit" SKF's summary judgment motion based on the
amendment.  See Order of Aug. 24, 2010.  These proposals, the
court reasoned, would lessen any prejudice that SKF would suffer
as a result of the late amendment.  At the court's direction, the
parties later agreed upon a schedule for briefing SKF's motion
for summary judgment on the amended promissory estoppel claim,
and have submitted memoranda (including a reply and sur-reply)
and supporting exhibits accordingly.

The court subsequently granted SKF's motion for sanctions in
part.  2010 DNH 171.  Because SKF had not convincingly shown that
the plaintiffs had intentionally or negligently destroyed
relevant evidence, the court ruled that their conduct did not
warrant dismissing the case.  Id. at 2-3.  Yet the court also

26

ruled that Rockwood's "intentional deletion of files, combined with [his] use of file-cleaning software on both his and Marchosky's laptops after SKF filed its motion to compel their production, supports drawing an adverse inference against Rockwood's credibility as a witness at any trial on the merits in this matter," where the court would serve as the factfinder.  Id.

## III. **Analysis**

In moving for summary judgment on the plaintiffs' amended promissory estoppel claim, SKF renews two of the arguments it made in moving for summary judgment on the plaintiffs' former promissory estoppel claim:  (1) they lack evidence of a promise by SKF to buy Environamics that is sufficiently specific to enforce under Pennsylvania law, which governs their claim by virtue of the choice-of-law clauses in the parties' agreements and (2) in any event, they could not have reasonably relied on such a promise as a matter of law, particularly in the face of their written agreement giving SKF the option to buy Environamics, rather than irrevocably committing it to do so. Because this second argument is correct, this court need not reach any aspect of the first argument.

The court will accept, for present purposes, the plaintiffs' contentions that New Hampshire law both governs their amended promissory estoppel claim and allows recovery for an "indefinite

27

or unclear" promise.  Contrary to the plaintiffs' suggestions, though, the New Hampshire version of the promissory estoppel doctrine does not simply allow the enforcement of promises "as justice requires."  There are other limitations on its reach, two of which are implicated here.  First, only "a promise reasonably understood as intended to induce action is enforceable by one who relies on it to his detriment or to the benefit of the promisor." Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 738 (1988) (citing Restatement (Second) of Contracts § 90 (1981)).  Promissory estoppel thus protects only "reasonable reliance" on the part of the promisor.  Marbucco Corp. v. City of Manchester, 137 N.H. 629, 633 (1993); see also Kaechele v. Nova Info. Sys., Inc., 2001 DNH 174, 7.  Second, "in all instances, application of promissory estoppel is appropriate only in the absence of an express agreement" on the same subject, unless that agreement is somehow unenforceable in contract.  Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 290 (1992).

As fully explained infra, these limitations are fatal to the plaintiffs' amended promissory estoppel claim.  First, there was an agreement between the parties dealing with SKF's purchase of Environamics:  the option agreement which, by its very nature, did not commit SKF to buy Environamics, but simply gave it the right to do so.  The plaintiffs have not suggested that this agreement was unenforceable.  New Hampshire's version of the

28

promissory estoppel doctrine, then, does not allow them to enforce the alleged promise to purchase Environamics, which is at odds with the express provisions of the option agreement.

Second, and relatedly, even if the very existence of the option agreement does not doom the plaintiffs' promissory estoppel claim, its terms necessarily prevent the plaintiffs from showing a genuine issue as to whether they could have reasonably relied on any other alleged promise by SKF to buy Environamics. The vast majority of the "words, conduct, and acts of assurance" allegedly comprising that promise occurred prior to the parties' execution of the option agreement. But that agreement expressly provided that it and the buy-sell agreement "constitute[d] the entire agreement and supersedes all prior agreements, conversations, understandings and negotiations, both written and oral, between the parties with respect to the subject matter hereof." This clause--contained in an agreement which, by its very nature, did not obligate SKF to buy Environamics--makes the plaintiffs' purported reliance on any prior "promise" to the contrary unreasonable as a matter of law.

The plaintiffs also point to certain post-agreement behavior by SKF as evincing a promise to buy Environamics, principally Richards's statements not to "worry about the loan and guarantee because SKF had committed to buy Environamics." But the plaintiffs cannot avoid summary judgment on their new promissory

estoppel claim based on those statements.  Given the existence of
the option agreement at that point, they could not have
reasonably relied on those statements as a promise to buy
Environamics on any other terms and, in amending their promissory
estoppel claim, they waived any theory that SKF promised to
exercise the option agreement.  Moreover, in avoiding summary
judgment against them on that theory, the plaintiffs
characterized those very same statements as a promise to buy
Environamics pursuant to the option agreement, so they cannot
characterize them differently now.  Finally, the plaintiffs'
argument that SKF entered into a joint venture with Environamics
is both irrelevant to the reasonableness of their reliance and
incorrect as a matter of law.

**A.    Promissory estoppel in the face of an enforceable agreement**

The New Hampshire Supreme Court discussed the reach of the
promissory estoppel doctrine in <u>Great Lakes Aircraft</u>:

> Traditionally, courts have applied promissory estoppel
> in order to enforce promises when consideration is
> lacking . . . .  More recently, however, its
> application has been expanded to enforce promises
> underlying otherwise defective contracts and promises
> made during the course of preliminary negotiations.
> In some instances it has been employed to provide a
> remedy for reliance upon offers subsequently
> withdrawn.  <u>But, in all instances, application of
> promissory estoppel is appropriate only in the absence
> of an express agreement</u>.  It serves to impute
> contractual stature based on an underlying promise,
> and to provide a remedy to the party who detrimentally
> relies on the promise.

135 N.H. at 290 (citations omitted; emphasis added).  New
Hampshire, then, adheres to a principle that, as one court has
observed, "enjoys near-universal acceptance in American
jurisdictions:"  promissory estoppel is not available in the case
of an express, enforceable agreement between the parties covering
the same subject-matter.  <u>Daisley v. Riggs Bank, N.A.</u>, 372 F.
Supp. 2d 61, 71 (D.D.C. 2005).[8]

     Here, as SKF points out, the plaintiffs do not dispute the
enforceability of the option agreement:  in contrast to the
situations, catalogued in <u>Great Lakes Aircraft</u>, which might
justify applying promissory estoppel, the option agreement was
not "defective" for lack of consideration, or because
negotiations never progressed beyond the preliminary stage, or
because the offer was withdrawn after reliance but before formal
acceptance.  135 N.H. at 290.  The plaintiffs also do not dispute
that the option agreement, which gave SKF the option to buy
Environamics, covered precisely the same subject as SKF's alleged
promise to buy Environamics—-and, by its very nature,

--------

[8]<u>See also</u>, <u>e.g.</u>, <u>All-Tech Telecom, Inc. v. Amway Corp.</u>, 174
F.3d 862, 869 (7th Cir. 1999) (applying Wisconsin law); <u>Gen.
Aviation, Inc. v. Cessna Aircraft Co.</u>, 915 F.2d 1038, 1042 (6th
Cir. 1990) (applying Michigan law); <u>Jhaver v. Zapata Off-Shore
Co.</u>, 903 F.2d 381, 385 (5th Cir. 1990) (applying Texas law);
<u>Alliance Grp. Servs., Inc. v. Grassi & Co.</u>, 406 F. Supp. 2d 157,
168 (D. Conn. 2005); <u>Kleinberg v. Radian Grp., Inc.</u>, 2002 WL
31422884, at *9 (S.D.N.Y. Oct. 29, 2002).

contradicted that alleged promise.  Cf. Glasshouse Sys., Inc. v. Int'l Bus. Machs. Corp., ___ F. Supp. 2d ___, No. 08-2831, 2010 WL 4104664, at *10 (E.D. Pa. Oct. 19, 2010) (denying summary judgment against a promissory estoppel claim, despite the parties' enforceable agreement, because the agreement did not cover the subject-matter of the promises); HealthNow N.Y., Inc. v. APS Healthcare Bethesda, Inc., No. 05-612, 2006 WL 659518, at *7 (N.D.N.Y. Mar. 10, 2006) (refusing to dismiss a promissory estoppel claim despite the parties' enforceable written agreement because the alleged promises did "not contradict" the agreement). Nor--aside from their unsupported characterizations of New Hampshire's promissory estoppel doctrine as marked by "discretion" and "flexibility"--do the plaintiffs offer any reason to believe that this state would allow promissory estoppel claims in the face of enforceable agreement to the contrary. Indeed, Great Lakes Aircraft expressly holds that, "in all instances," such claims are not "appropriate."  135 N.H. at 290.

Refusing to enforce promises inconsistent with an enforceable written agreement, moreover, is in keeping with the fundamental principle of New Hampshire law that "courts cannot make better agreements than the parties themselves entered into or rewrite contracts merely because they might operate harshly or inequitably."  Livingston v. 18 Mile Point Drive, Ltd., 158 N.H. 619, 623-24 (2009) (quotation marks omitted).  Here, allowing the

plaintiffs to enforce SKF's alleged promise to buy Environamics
would not only rewrite the option agreement, but fundamentally
transform it into a stock purchase agreement, which is simply not
the bargain the parties struck.  Promissory estoppel does not
permit "circumvention of carefully designed rules of contract
law" in the name of "equity."  <u>All-Tech Telecom</u>, 174 F.3d at 869.

Furthermore, even if those rules themselves posed no formal
barrier to applying promissory estoppel in the face of an
enforceable written agreement, there is the closely related
problem that "reliance on a promise cannot be reasonable when it
is completely at odds with the terms of a written agreement
covering the same transaction." <u>Daisley</u>, 372 F. Supp. 2d at 71
n.5; <u>see also</u>, <u>e.g.</u>, <u>DDCLAB Ltd. v. E.I. DuPont de Nemours & Co.</u>,
No. 03-3654, 2005 WL 425495, at *6 (S.D.N.Y. Feb. 18, 2005);
<u>Kleinberg</u>, 2002 WL 31422884, at *10.  In fact, the court of
appeals has endorsed the view that the "conflicting content" of a
promisor's oral and written statements to a promisee generally
makes it unreasonable for him "to rely on either statement":

> Confronted by such a conflict a reasonable person
> investigates matters further; he receives assurances
> or clarification before relying.  A reasonable person
> does not gamble with the law of the excluded middle,
> he suspends judgment until further evidence is
> obtained.  Explicit conflict engenders doubt, and to
> rely on a statement the veracity of which one should
> doubt is unreasonable.  The law does not supply
> epistemological insurance.  Nor does it countenance
> reliance on one of a pair of contradictories simply
> because it facilitates the achievement of one's goal.

Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 33-34 (1st Cir. 1988); see also Sands v. Ridefilm Corp., 212 F.3d 657, 664 (1st Cir. 2000) ("It was unreasonable for the plaintiff to rely on the alleged oral representations because of the express written word" to the contrary).[9]

Those observations are right on the mark here.  Whatever SKF may have communicated to the plaintiffs about its intentions toward Environamics, through "words, conduct, and acts of assurance" or otherwise, the fact remains that the parties also entered into a detailed written agreement which did not obligate SKF to buy Environamics, but merely conveyed the option to do so. In light of the express provisions of that agreement--indeed, in light of its very nature--the plaintiffs could not, as a matter of law, have reasonably relied on the contrary promise that SKF was "buying the company."  See, e.g., Trifiro, 845 F.2d at 33-34. The existence of an enforceable agreement between the parties that expressly covered the same subject as SKF's alleged promise (and expressly contradicted its terms) entitles SKF to summary judgment on the amended promissory estoppel claim.  See Great Lakes Aircraft, 135 N.H. at 290.

---

[9]Though these cases applied Massachusetts law, their observations as to commercial reasonableness carry weight beyond the borders of the Commonwealth.

**B.    Unreasonable reliance**

**1.    Pre-agreement statements and conduct**

Even if the very existence of the option agreement did not doom the plaintiffs' amended promissory estoppel claim, its integration clause would still have prevented the plaintiffs from reasonably relying on nearly all of the "words, conduct, and acts of assurance" allegedly constituting SKF's promise to buy Environamics.  Consistent with its holdings, just discussed, that reliance on conflicting oral and written statements is unreasonable, the court of appeals has also observed that "[w]here a written statement conflicts with a <u>prior</u> oral representation, reliance on the oral representation is generally held to be unreasonable."  <u>Coll v. PB Diagnostics Sys., Inc.</u>, 50 F.3d 1115, 1124 (1st Cir. 1995) (emphasis added) (applying Massachusetts law).  This rule has particular force where that written statement takes the form of a fully integrated contract between the promisor and the promisee, i.e., providing that it constitutes the entire agreement between them.  <u>See</u>, <u>e.g.</u>, <u>Vision Graphics, Inc. v. E.I. Du Pont de Nemours & Co.</u>, 41 F. Supp. 2d 93, 99-100 (D. Mass. 1999)[10].  Where the plaintiff has thus

---

[10]<u>See also</u>, <u>e.g.</u>, <u>Yorktowne Urology, P.C. v. Neuisys, LLC</u>, No. 10-644, 2010 WL 3328067, at *3 (M.D. Pa. Aug. 23, 2010); <u>McVickers McCook, LLC v. Wal-Mart Stores, Inc.</u>, No. 09-7523, 2010 WL 3283044, at *6 (N.D. Ill. Aug. 12, 2010); <u>Bradley v. Kryvicky</u>, 574 F. Supp. 2d 210, 223 (D. Me. 2008); <u>Mann v. GTCR Goldner Rauner, L.L.C.</u>, 425 F. Supp. 2d 1015, 1036 (D. Ariz. 2006).

manifested his assent to the absence of other agreements with the
defendant, continued reliance on the defendant's prior promises—-
which, if enforced, would produce just such an agreement—-is
simply unreasonable as a matter of law.[11]  See, e.g., Mack v.
Earle M. Jorgensen Co., 467 F.2d 1177, 1179 (7th Cir. 1972)
(applying Wisconsin law).

In light of its statement that, again, "application of
promissory estoppel is appropriate only in the absence of an
express agreement," Great Lakes Aircraft, 135 N.H. at 290, there
is no reason to think the New Hampshire Supreme Court would not
follow this well-established rule.  The plaintiffs have offered
no authority or argument to the contrary and do not even address
this point in their briefing.[12]  Moreover, they conceded at oral
argument that SKF's pre-agreement statements did not form any
basis for reliance.  So, the evidence of SKF's "words, conduct,

_____

[11]Some courts have reasoned instead that, in the face of a
fully integrated written agreement, reliance on prior
inconsistent promises is barred by the parol evidence rule.  See,
e.g., Bradley, 574 F. Supp. 2d at 223-24 (citing cases).  But
resolving the present summary judgment motion does not require
this court to choose between these two rationales for barring
promissory estoppel claims based on representations made prior to
a fully integrated agreement covering the same subject.  It is
enough to point out that such claims are not permitted.

[12]They do not dispute, then, that the option agreement
represented a complete integration under New Hampshire law.  See,
e.g., Behrens v. S.P. Constr. Co., 153 N.H. 498, 504 (2006)
("Though not dispositive, an integration clause is evidence that
the parties intended the writing to be a total integration.").

and acts of assurance," prior to the parties' execution of the option agreement, that allegedly manifested a promise to buy Environamics, see Part II.A.2, supra, fails to create a genuine issue of fact as to whether the plaintiffs could have reasonably relied on any such promise.  See, e.g., Vision Graphics, 41 F. Supp. 2d at 100 ("where the written contract contains an integration clause, conflicting oral assurances about future behavior cannot provide the evidentiary fuel" to sustain a promissory estoppel claim) (citing Coll, 50 F.3d at 1124-25).

This is doubly true of the plaintiffs' evidence of pre-agreement communications--internal to SKF--that assertedly demonstrate its "lust[] for Environamics technology and patents." See note 1, supra.  Not only did those communications occur prior to the execution of the fully integrated option agreement, but they also, so far as the record reflects, never reached the plaintiffs.  These internal communications therefore could not have formed part of any promise on which they reasonably relied. After all, "a promise is a manifestation of intention to act or refrain from acting in a specified way," Restatement (Second) of Contracts § 2(1), and "the phrase 'manifestation of intention' . . . means the external expression of intention as distinguished from undisclosed intention," id. cmt. *b.*

37

**2.    Post-agreement statements and conduct**

As further support for their promissory estoppel claim, the plaintiffs point to certain alleged words and deeds by SKF subsequent to the execution of the option agreement--principally Richards's statements not to "worry about the loan and guarantee because SKF had committed to buy Environamics."  While the integration clause, which applied only to "prior agreements, conversations, understandings and negotiations," would not reach these alleged statements, they still do not create a genuine issue of fact as to whether the plaintiffs reasonably relied on any promise by SKF.

As SKF justifiably complains, the plaintiffs advanced a much different characterization of Richards's alleged comments, and their understanding of those comments, in response to its first summary judgment motion.  When SKF argued that any alleged promise underlying the plaintiffs' promissory estoppel claim was insufficiently specific to be enforceable, the plaintiffs pointed to their deposition testimony about SKF's statements that "if they took out and personally guaranteed the Wells Fargo loan, SKF would buy their stock in Environamics <u>pursuant to the option agreement</u>" (emphasis added), which itself supplied the necessary specifics.  <u>See</u> Part II.B.2, <u>supra</u>.  Discussion of this testimony at oral argument on the motion resulted in an order for the plaintiffs to file affidavits stating "the time, place and

specific content" of the communications comprising the alleged promise.  In response, the plaintiffs filed affidavits stating that, in a series of telephone calls in and around April 2004, Richards repeatedly told them that "SKF was going to <u>exercise its</u> <u>option under the Option Agreement</u> and buy the company" (emphasis added).  The court then denied SKF's summary judgment motion.

But now, in response to SKF's second summary judgment motion, the plaintiffs characterize those very same conversations with Richards as manifesting a promise not to "worry about the loan and guarantee because SKF had committed to buy Environamics," i.e., without reference to the option agreement. This recharacterization was necessitated, of course, by the plaintiffs' intervening shift in their promissory estoppel theory:  instead of arising out of SKF's alleged promises to "definitely exercise its option to purchase Environamics stock pursuant to the terms of the Option Agreement," as articulated in the second amended complaint, it now arises out of "the larger and more general promise, 'don't worry, we are buying your company,'" as articulated in the third amended complaint.[13]

---

[13]This recharacterization, in turn, was presumably necessitated by Judge Barbadoro's concerns, expressed at the hearing on SKF's first summary judgment motion, that the plaintiffs had repudiated any agreement by SKF to buy Environamics pursuant to the option agreement.  <u>See</u> Part II.B.2, <u>supra</u>.

This about-face cannot save the plaintiffs from the second summary judgment motion, for at least three reasons.  To start with, "[t]he doctrine of judicial estoppel generally prevents a party from prevailing in one phase of case on an argument and then relying on a contradictory argument to prevail in another phase."  Redeford v. U.S. Airways, Inc., 589 F.3d 30, 38 (1st Cir. 2009) (quotation marks omitted).  In their responses to the first and then to the second motion for summary judgment, the plaintiffs have offered contradictory characterizations of Richards's alleged statements to them in and around April 2004: first, they claimed he said that SKF would buy Environamics pursuant to the option agreement, and now they claim he said only that SKF would buy Environamics, without specifying further.

As the court recognized in allowing the plaintiffs to amend their promissory estoppel claim over SKF's judicial estoppel argument, "[i]t is not logically impossible that SKF could have engaged in certain conduct toward the plaintiffs that caused them to believe it was buying their company under the Option Agreement, and other conduct toward the plaintiffs that caused them to believe SKF was buying their company on some other terms."  Order of Aug. 24, 2010.  It is logically impossible, though, that the very same conduct, i.e., Richards's statements in an around April 2004, reasonably caused the plaintiffs to believe that SKF was doing both.

40

This is not to say that, if Richards did in fact promise that SKF would buy Environamics pursuant to the option agreement, the plaintiffs might not have reasonably taken _other_ statements or conduct by SKF as the "larger, more general promise" they now assert. But see id. (suggesting that, under such circumstances, "relying on either promise was not particularly reasonable"); Part III.A, _supra_ (discussing the problem of reliance on inconsistent statements). On this theory, as the plaintiffs argued in support of their motion to amend, they could have taken Richards's statements to corroborate the "larger, more general promise" to buy Environamics that had been manifested through other words or deeds. But without evidence of other words or deeds on which the plaintiffs could have reasonably relied, they are left to argue that SKF promised to buy Environamics based solely on statements they previously argued were a promise to exercise the option agreement.

Those arguments are in direct conflict. See, e.g., _Patriot Cinemas, Inc. v. Gen. Cinemas Corp._, 834 F.2d 208, 214 (1st Cir. 1987) (judicial estoppel arises when a party "adopts inconsistent positions on combined questions of fact and law"). Furthermore, there is no question that the plaintiffs "prevailed" against SKF's first motion for summary judgment by characterizing Richards's statements as a promise to buy Environamics pursuant to the option agreement. As discussed in Part II.B.2, _supra_,

41

they offered this characterization in response to SKF's argument
that any claimed promise was too indefinite to enforce, as well
as Judge Barbadoro's order to file affidavits detailing the
alleged statements so that he could properly consider that
argument.  After receiving those affidavits, of course, he denied
the motion for summary judgment, so "[t]here is no question but
that the . . . court bought what [the plaintiffs were] selling
the first time around."  Alt. Sys. Concepts, Inc. v. Synopsys,
Inc., 374 F.3d 23, 34 (1st Cir. 2004).

Nor is there any question that, if they were allowed to
recharacterize Richards's alleged statements in response to SKF's
second summary judgment motion, the plaintiffs would gain the
sort of "unfair advantage" that judicial estoppel serves to
prevent.  See id.  Faced with an argument that SKF's alleged
promises to buy Environamics were too vague, the plaintiffs
sought to fill that gap with Richards's explicit promises to
exercise the option.  But now, faced with an argument that they
repudiated the option agreement, see note 13, supra--to say
nothing of their express waiver of any claims "that specifically
arise in connection with the Option Agreement" as a condition of
getting leave to amend their promissory estoppel claim, see part
II.B.4, supra--they seek to divorce Richards's statements from
the option agreement altogether.  Judicial estoppel bars the
plaintiffs from relying on this "revisionist" version of

Richards's alleged statements to avoid summary judgment again.
Alt. Sys. Concepts, 374 F.3d at 34.

Second, even if judicial estoppel did not apply, the
testimony they offer in support of their amended promissory
estoppel claim conflicts with the testimony they offered in
support of their prior promissory estoppel claim.  As already
noted, the plaintiffs' affidavits submitted in response to Judge
Barbadoro's order attested that Richards had said, in a series of
telephone calls in and around April 2004, "not to worry about
taking out the Wells Fargo loan because SKF was buying their
stock in Environamics under the Option Agreement," that "SKF was
going to exercise its option under the Option Agreement and buy
the company," and that the president of SKF's service division,
Poland, "had confirmed . . . .  SKF would buy the company under
the Option Agreement."  See Part II.B.2, supra.  But the
plaintiffs' affidavits submitted in response to the present
summary judgment motion attest, in describing the very same
conversations, that Richards said that "SKF had committed to buy
Environamics"--omitting any reference to the option agreement.

The court of appeals has "repeatedly held that a party
opposing summary judgment may not manufacture a dispute of fact
by contradicting his earlier sworn testimony without a
satisfactory explanation of why the testimony has changed."
Abreu-Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001).  The

plaintiffs do not even acknowledge, let alone attempt to explain, the shift in their testimony about what Richards told them in and around April 2004.  Thus, the plaintiffs' new versions of those conversations--in which Richards allegedly made promises to purchase Environamics by reassuring them that "SKF had committed to buying" it but without referring to the option agreement--do not create a genuine issue as to whether the plaintiffs could have reasonably relied on any such promise.  See id.

Third, even putting aside what might be classified as the formal problems occasioned by the plaintiffs' attempts to change their version of what Richards promised them does not eliminate the substantive problem with their reliance on that alleged promise:  it could not have been reasonably understood as a promise to do anything other than to exercise the option pursuant to the option agreement.  Whether or not Richards made reference to that agreement during his conversations with the plaintiffs in and around April 2004, the agreement was in place at that point, having been signed just three months earlier.  In that context, there was only one way to reasonably understand any statement by Richards that "SKF had committed to buying Environamics," i.e., that SKF had committed to buying Environamics pursuant to the option agreement (which, of course, is precisely what the plaintiffs argued in response to the first summary judgment motion).  But as the plaintiffs would now have it--and need to

44

have it, since, again, they have expressly disclaimed any theory of recovery that arises out of the option agreement--they reasonably understood Richards's statements as part of a "larger, more general promise" to buy Environamics on some other terms. No rational finder of fact could accept that.  So the plaintiffs' latest version of what Richards told them, even if taken at face value, does not create a genuine issue as to whether they reasonably relied on any alleged promise by SKF.

Aside from Richards's statements, the only other actions the plaintiffs have identified as manifesting the alleged promise, and which occurred after the execution of the option agreement, were part of SKF's efforts to market Environamics products.[14] The plaintiffs complain that these efforts (which included the visits by SKF sales personnel to Environamics customers, the use of SKF forms in filling Environamics orders, and the dissemination of marketing materials identifying Environamics's products as SKF's, see Part II.A.3, supra) accomplished a "usurpation" of their company.  The court agrees with SKF, though, that these actions were contemplated by the buy-sell agreement--if not by its express terms, then by its very nature

---

[14]The plaintiffs also point to some of SKF's internal communications during this time frame, see notes 2, 4, 5, supra, but, again, they did not see those communications until after they filed this lawsuit, so they could not have comprised part of any promise on which the plaintiffs reasonably relied.  See Part III.B.1, supra.

in appointing SKF as the exclusive distributor of Environamics products.

So, while the plaintiffs argue that SKF's marketing materials provide "vivid evidence . . . that it was SKF's conscious plan for Environamics to forego its independent identity" and, presumably, be acquired by SKF, in reality the buy-sell agreement specifically entitled SKF to require Environamics to equip its pumps with SKF bearings, and to mark those pumps with an "SKF" label.  The fact that SKF depicted the pumps with just such a label in the marketing materials, then, could not have reasonably been taken as a promise that SKF would buy Environamics.  Indeed, it is difficult to see how the parties would have realistically carried out the exclusive buyer-seller relationship effected by the agreement--under which Environamics could sell its products only through SKF, and SKF could not sell such products unless they were made by Environamics--without these kinds of measures.[15]

Moreover, even if the plaintiffs perceived a deeper significance in this behavior, as they now claim, the only significance could have been that SKF would exercise its option

---

[15]The same goes for the other behavior identified by the plaintiffs in their surreply, e.g., insisting that Environamics borrow money and spend it to pay its suppliers.  The only intention this could reasonably evince is that Environamics remain able to manufacture the products to be distributed by SKF under the buy-sell agreement.

to buy Environamics.  Again, the option agreement was already in place when this behavior occurred (and, not coincidentally, the exclusivity provisions of the buy-sell agreement had the same duration as SKF's right to exercise the option).  Thus, even if a rational factfinder could conclude that SKF's actions exceeded what was contemplated by the buy-sell agreement, as the plaintiffs maintain, no rational factfinder could identify any promise in that behavior besides a promise to buy Environamics under the option agreement.  But, as just discussed, the plaintiffs have withdrawn any claim based on such a promise in favor of a claim based on a "larger, more general" one.  They cannot avoid summary judgment on that claim, even if there is a dispute over whether SKF's marketing campaign went overboard.

### 3.   Other arguments for reasonable reliance.

The plaintiffs also make two other arguments in an attempt to avoid summary judgment due to their lack of proof of reasonable reliance.  First, they argue that "SKF should be estopped from asserting that the Plaintiffs' reliance on its cumulative words and conduct was unreasonable" because their "detrimental reliance was occasioned by SKF's design and direction," citing Appeal of Cloutier Lumber Co., 121 N.H. 420 (1981).  But Cloutier (which dealt with equitable, not promissory, estoppel) holds simply that estoppel arises when "one

47

party has knowingly made representations upon which the other has
reasonably relied to his detriment." Id. at 422 (emphasis
added).  The case does not hold--as the plaintiffs seem to be
saying--that estoppel can arise simply because the defendant
intends for the plaintiff to rely on the defendant's
representations, even if it would be unreasonable to do so.

So, while it may be fair to infer, particularly from the
circumstances surrounding Richards's alleged statements not to
"worry about the loan and guarantee because SKF had committed to
buy Environamics," that SKF wanted the plaintiffs to rely on its
statements, that intent does not itself turn the statements into
actionable promises.  The plaintiffs have provided no authority
for the contrary notion, i.e., that the defendant's intent for
the plaintiff to rely on a promise allows the plaintiff to
recover even if his reliance was unreasonable.  As already
discussed, reasonable reliance is an essential element of
promissory estoppel under New Hampshire law. See Marbucco, 137
N.H. at 633; Kaechele, 2001 DNH 174, 7.

Second, the plaintiffs argue at length that SKF effectively
entered into a joint venture relationship with Environamics,
creating "an independent fiduciary obligation" which rendered the
plaintiffs' reliance "even more reasonable."  The court can
accept neither the premise nor the conclusion of this argument.
Joint venturers indeed owe each other fiduciary duties, see Miami

48

<u>Subs Corp. v. Murray Family Trust</u>, 142 N.H. 501, 513 (1997) (citing 46 Am. Jur. <u>Joint Ventures</u> § 33 (1994)), including "good faith and full disclosure," <u>id.</u>  But "[a]n agreement or contract is essential to the creation of the relation between joint venturers, since a joint venture may exist only by voluntary agreement of the parties and cannot arise by operation of law." 46 Am. Jur. 2d <u>Joint Ventures</u> § 9 (2006) (footnotes omitted). Thus, while "[t]he existence of a joint venture may be inferred from facts and circumstances demonstrating that the parties in fact undertook a joint enterprise . . . , the existence of a different type of express contract would in itself be inconsistent with a claimed relationship of joint venture by implication."  <u>Id.</u> (footnotes omitted).

Here, of course, "a different type of express contract" existed, namely, the buy-sell agreement, which specifically provided that "[t]he relationship of the parties under this Agreement shall be and at all times remain one of independent contractors and not principal and agent, partners, or joint venturers."  No rational factfinder could conclude that, despite the express agreement between SKF and Environamics that they were not creating a joint venture, that was in fact what they agreed to do.  There is, as always, the theoretical possibility that the parties implicitly agreed to modify both the buy-sell agreement and its clause preventing such unwritten modifications, <u>cf.</u> <u>Prime</u>

49

Fin. Grp., Inc. v. Masters, 141 N.H. 33, 37 (1996), but the
plaintiffs have not come forward with evidence to turn that
theoretical possibility into a genuine issue of fact.

Indeed, the record reflects that SKF uttered the words
"joint venture" to the plaintiffs only once, in the letter
Richards gave Rockwood to assist in procuring financing. See
Part II.A.3, supra. This fails to show the meeting of the minds
essential to the oral modification of the buy-sell agreement
which is in turn essential to the existence of a joint venture
despite that agreement's provision to the contrary. See Guaraldi
v. Trans-Lease Grp., 136 N.H. 457, 461 (1992).

Nor, as SKF points out, have the plaintiffs assembled any of
the other evidence courts generally use in determining the
existence of a joint venture by implied agreement, e.g., the
contribution of assets to a common undertaking, a joint property
interest in the subject of the venture, a shared right to
participate in its management, an expectation of and a right to
share in profits, and a duty to share in losses. See, e.g.,
Petricca Dev. Ltd. P'ship v. Pioneer Dev. Co., 214 F.3d 216, 222
(1st Cir. 2000) (applying Massachusetts law). Without any such
proof, SKF's "[m]erely calling the relationship a joint venture
. . . does not make it so." Optimum Techs., Inc. v. Henkel
Consumer Adhesives, Inc., 496 F.3d 1291, 1249 (11th Cir. 2007)
(applying Georgia law). The plaintiffs have not shown a genuine

50

issue of fact as to the existence of a joint venture between SKF and Environamics.

Furthermore, even if SKF and Environamics had agreed to enter into a joint venture, the plaintiffs have not explained how that made it reasonable for them to rely on SKF's alleged promises to buy Environamics in the face of an express agreement to the contrary.  The plaintiffs seem to be saying that SKF, by acting like it was buying Environamics but ultimately not following through, breached the fiduciary duty owed as a joint venturer.  Their claim, however, is for promissory estoppel, not breach of fiduciary duty, and needless to say they cannot be allowed to amend their complaint yet again--well past the deadline for amendments, and in the face of SKF's second summary judgment motion--to assert such a claim.  See, e.g., O'Connell v. Hyatt Hotels of P.R., 357 F.3d 152, 155-56 (1st Cir. 2004).  In any event, the plaintiffs could never have brought a claim against SKF for breach of fiduciary duty, because if SKF owed that duty to anyone, it was their alleged co-venturer Environamics, not the plaintiffs individually, as they acknowledged at oral argument.

Finally, even if there had been a fiduciary relationship between SKF and the plaintiffs themselves, "[t]here is no question that someone's claimed reliance on representations--even those made by a fiduciary--must be reasonable" to support an

51

estoppel claim.  <u>Siegel v. Braver</u>, No. 10-541, 2010 WL 1883459, at *2 (N.D. Ill. May 11, 2010); <u>see also</u>, <u>e.g.</u>, <u>Brant v. Principal Life & Disability Ins. Co.</u>, 50 Fed. Appx. 330, 332 (8th Cir. 2002) (affirming dismissal of an estoppel claim arising out of a fiduciary's representations for want of "evidence showing reasonable and detrimental reliance"); <u>J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.</u>, 76 F.3d 1245, 1258 (1st Cir. 1996) (ruling that the parties' fiduciary relationship did not excuse the plaintiff's failure to use the reasonable diligence in its affairs with the defendant that would toll a claim against it under the discovery rule).  So the plaintiffs' joint venture theory, even if taken at face value, does not substitute for a showing of the reasonable reliance necessary to prevail on their promissory estoppel claim.[16]

## IV.  <u>Conclusion</u>

For the foregoing reasons, SKF's second motion for summary judgment[17] is GRANTED.  While the motion is directed only at the plaintiffs' amended promissory estoppel claim, they acknowledged

---

[16]If anything, the fact that the plaintiffs thought SKF had entered into a joint venture with Environamics tends to make their reliance on claimed promises of an acquisition less reasonable, since a joint venture is a completely different form of corporate transaction.  <u>Cf.</u> <u>Petricca</u>, 214 F.3d at 222 (distinguishing between the relationship created by an option to purchase and a joint venture).

[17]Document no. 187.

at oral argument that this claim represents their "whole case" at this point.  In light of this concession--which is consistent with the court's view of the relationship of the promissory estoppel claim to the other counts left in the third amended complaint--the clerk shall enter judgment for SKF accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  December 17, 2010

cc:  Donald C. Crandlemire, Esq.
     Steven M. Gordon, Esq.
     William E. Aivalikles, Esq.
     David Richman, Esq.
     Gregory A. Moffett, Esq.
     Matthew R. Williams, Esq.
     Peter G. Callaghan, Esq.
     Alexander J. Walker, Esq.